**Ricardo URDINARAN, M.D., Plaintiff,**

v.

**William B. AARONS, Jr., M.D., Francis J. Previti, M.D., Boardwalk Surgery Associates, P.A., Susan Bane, M.D., Atlanatic City Medical Center, John Does 1 Through 50, Inclusive, Fictious Named Defendants, Jointly, Severally, and in the Alternative, Defendants.**

Civil Action No. 99–00540(JEI).

United States District Court, D. New Jersey.

Sept. 26, 2000.

Van Syoc Chartered by James E. Burden, Cherry Hill, NJ, for Plaintiff.

Fox, Rothschild, O'Brien & Frankel, LLP by William M. Honan, Kathryn D. Portner, Atlantic City, NJ, Defendants.

## OPINION

IRENAS, District Judge.

Presently before the court is Defendants William B. Aarons, M.D., Francis J. Previti, M.D., Boardwalk Surgery Associates, P.A., Susan Bane, M.D., and Atlantic City Medical Center's motion for summary judgment on Plaintiff Ricardo Urdinaran, M.D.'s claims alleging antitrust violations under the Sherman Act, the Clayton Act, and the New Jersey Antitrust Act and his claims alleging fraudulent misrepresentation, malicious interference with prospective economic advantage, and breach of contract. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1367. For the reasons set forth below, the Defendant's motion for summary judgment is granted as to Plaintiff's federal and state antitrust claims. Because the Court is disposing of all claims over which it has original jurisdiction, the Court declines to exercise its supplemental jurisdiction over the remaining state contract and tort claims.

## I. BACKGROUND

Plaintiff Ricardo Urdinaran was a general surgeon practicing at Shore Memorial Hospital and Defendant Atlantic City Medical Center ("ACMC"). In June of 1995, Plaintiff relinquished certain medical privileges at ACMC. In November of 1996, Plaintiff sought reinstatement of those privileges. After an extensive hearing and various appeals, Plaintiff ultimately was denied reinstatement.

The first phase of the events leading to this litigation occurred between Spring of 1994 and Summer of 1995. On May 17, 1994, the Quality Assessment Committee ("QAC") at ACMC, chaired by Defendant William B. Aarons, M.D. ("Dr. Aarons"), sent Plaintiff a letter requesting information regarding the death of one of his patients a month earlier. The QAC's function is to ensure patient care quality by reviewing cases flagged for potential problems. On March 4, 1995, the QAC again requested an explanation regarding Plaintiff's treatment of the patient. Plaintiff did not respond to either inquiry.

On April 13, 1995, the QAC met to consider several of Plaintiff's cases. According to the minutes of the meeting, the QAC found "a demonstrated pattern of judgmental and technical failures," including, in two cases, Plaintiff's failure to order CT scans before performing exploratory surgery. Dr. Aarons testified, and the minutes reflect, that the QAC recommended corrective action be initiated against Plaintiff. Several weeks after the meeting, on June 3, 1995, Plaintiff was involved in another patient incident, in which he accidentally inserted a catheter into an artery rather than a vein, a mishap which required repair by another surgeon.

On the morning of June 9, 1995, Defendants Dr. Aarons and Francis J. Previti, M.D. ("Dr.Previti"), who was Chairman of the Department of Surgery, met with Plaintiff to discuss his performance. Drs. Aarons and Previti told Plaintiff he could either voluntarily relinquish his surgical privileges or could face corrective action subject to ACMC's Fair Hearing Committee. Dr. Aarons told Plaintiff that, in his opinion, he would likely lose his surgical privileges. Plaintiff alleges, and Drs. Aarons and Previti deny, that they threatened Plaintiff with summary suspension if he did not relinquish his privileges. Plaintiff requested monitoring as an alternative, but Dr. Aarons told him such a solution would be too onerous.

Plaintiff contends that Drs. Aarons and Previti, having learned of Plaintiff's burgeoning practice, conspired to deprive Plaintiff of his privileges at ACMC and thus appropriate some of his business due

to a need to support a new associate in Dr. Previti's practice.[1]

On June 19, 1995, after consulting a lawyer and discussing his options with several physicians, including Defendant Susan Bane, M.D. ("Dr.Bane"), Plaintiff relinquished his privileges at ACMC with regard to intra-abdominal surgery, requested relief from his ACMC emergency room duties, and resigned from ACMC's trauma team.

On November 12, 1996, Plaintiff sought reinstatement of his privileges at ACMC. After the ACMC Medical Staff Executive Committee denied his request purportedly on the basis of his previous resignation and Plaintiff's failure to provide the credentials committee with sufficient evidence of his then current clinical competence, Plaintiff requested a hearing before the Fair Hearing Committee ("FHC"), as provided for in the ACMC By–Laws. The hearing, which began on May 22, 1997, lasted seven days. Finding unjustified deviations in Plaintiff's performance and no evidence that Drs. Previti and Aarons were motivated by economic self-interest, the FHC recommended that the Executive Committee affirm its previous denial of Plaintiff's privileges, which the Executive Committee did on December 19, 1997. After the Board of Governors then affirmed the Executive Committee's decision, Plaintiff requested appellate review by an appeals panel of the Board of Governors, which, on April 22, 1998, affirmed the Board's prior decision.

At all relevant times, Plaintiff continued to practice at Shore Memorial Hospital and retained some privileges at ACMC. In Atlantic County, which Plaintiff claims is the relevant geographic market, there is also a third hospital, Kessler Memorial Hospital, at which Plaintiff did not have privileges. In general surgery, which Plaintiff claims is the relevant product market, there were thirty-four other surgeons practicing at these three hospitals during this period.

On February 5, 1999, Plaintiff filed suit against Defendants ACMC, Drs. Previti, Aarons, and Bane, Boardwalk Surgery Associates, and John Does 1–50. Plaintiff contends that he was unfairly coerced into relinquishing his privileges at ACMC and that the entire peer review process was unfairly biased, all part of a conspiracy to oust him from the hospital and appropriate his business. In the First and Second Counts, Plaintiff alleges that Defendants acted to restrain competition and interstate and intrastate trade and to monopolize or attempt to monopolize in violation of the Sherman Act, 15 U.S.C. §§ 1, 2, the Clayton Act, § 4, 15 U.S.C. § 15(a), and the New Jersey Antitrust Act, N.J.S.A. 59:9–4(a), *et seq.* Plaintiff also alleged fraudulent misrepresentation (Third Count), malicious interference with prospective economic advantage (Fourth Count), and breach of contract, on the theory that the By–Laws constituted a contract between Plaintiff and ACMC (Fifth Count).

On July 24, 2000, Defendants filed a motion for summary judgment.

## II. STANDARD OF REVIEW

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."

1. Dr. Aarons and Dr. Previti merged practices in March 1997.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Despite the "factually intensive" nature of antitrust cases, "the standard of Fed. R.Civ.P. 56 remains the same." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.,* 959 F.2d 468, 481 (3d Cir.) (in banc) (citations omitted), cert. denied, 506 U.S. 868, 113 S.Ct. 196, 121 L.Ed.2d 139 (1992). There is no "special burden ... [for] summary judgment in antitrust cases." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 468, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

## III. DISCUSSION

### A. Sherman Act Section 1

Section 1 of the Sherman Act provides: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations is declared illegal.

15 U.S.C. § 1 (1994). To establish a claim under Section 1, a plaintiff must demonstrate: (1) concerted action by the defendants; (2) that produced anticompetitive effects on interstate commerce within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that plaintiff was injured as a proximate result of the concerted action. *See Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 639 (3d Cir.1996).

### 1. Concerted Action

■ "The very essence of a section 1 claim, of course, is the existence of an agreement." *Alvord–Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 999 (3d Cir.1994). A " 'unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement' " must exist to trigger section 1 liability. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (quoting *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)).

Thus, to establish concerted action, a plaintiff must demonstrate an agreement or arrangement between at least two independent, self-interested economic entities. *Copperweld,* 467 U.S. at 766–71, 104 S.Ct. 2731. In this case, Plaintiff alleges that the individual named Defendants, the review committees, and the hospital acted in concert to deny him privileges.

In *Weiss v. York Hospital,* 745 F.2d 786 (3d Cir.1984), the Third Circuit held that, because the individual members of a hospital medical staff have independent economic interests, such a group, when acting as a group, may constitute a combination for purposes of Section 1. *Id.* at 814; *see also Nanavati v. Burdette Tomlin Mem. Hosp.,* 857 F.2d 96, 118 (3d Cir.1988).

To establish such a combination or conspiracy between individual actors, however, Plaintiff must provide "evidence that tends to exclude the possibility of independent action.... That is, there must be direct or circumstantial evidence that reasonably tends to prove ... a conscious commitment to a common scheme designed to achieve an unlawful objective." *Nanavati,* 857 F.2d at 119 (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). While Plaintiff makes clear his suspicions that Defendants Drs. Previti, Aaron, and Bane unlawfully conspired against him, he provides no evidence which tends to prove that their actions were illegitimate. As the court stated in *Farr v. Healtheast, Inc.,* 1993 WL 220680 (E.D.Pa. June 9, 1993), "[e]ven if the ultimate peer review decision is consistent with the economic interests of a competitor, conspiracy cannot be inferred from whole cloth." *Id.* at *5.

Finally, as the court further held in *Weiss,* as a matter of law, a hospital cannot conspire with its medical staff. *Weiss,* 745 F.2d at 817.

The medical staff was empowered to make staff privilege decisions on behalf of the hospital. As such, with regard to these decisions, the medical staff operat-

ed as an office of a corporation would in relation to the corporation. Although the members of the medical staff had independent economic interests in competition with each other, the staff as an entity had no interest in competition with the hospital.

*Id.* at 817. Therefore, Plaintiff can not establish that there was a conspiracy as between the Defendant members of the medical staff and the hospital.

## 2. Restraint of Trade Injurious to Competition

To satisfy the second prong, Plaintiff must demonstrate that Defendants' actions "produced anticompetitive effects on interstate commerce within the relevant product and geographic markets." *Mathews,* 87 F.3d at 639.

### a. Anticompetitive Effects

█ It is well-settled that the gravamen of an antitrust action is the alleged restraint's effect on competition, not competitors. *See Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 727 (3d Cir.1991) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). For a restraint of trade to be anti-competitive, defendants must possess market power in the relevant markets. *See Farr,* 1993 WL 220680, at *6. "Market power is the power to force a purchaser to do something that he would not do in a competitive market ... [i.e] the ability of a single seller to raise price and restrict output." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 464, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 14, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *Fortner Enters., Inc. v. United States Steel Corp.,* 394 U.S. 495, 503, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969)). It is ordinarily "inferred from the seller's possession of a predominant share of the market." *Id.*

Assuming for the moment that the Atlantic County is the relevant geographic market, there were three hospitals and thirty-five general surgeons practicing there. Plaintiff has not even started to establish his claim that any of those hospitals or any combination of physicians had market power in that area.

Moreover, Plaintiff has not provided evidence of rising prices or restricted output from which the Court might infer market power. Because medical fees are largely dictated by health insurance companies, Medicaid, and Medicare, courts have looked also at other indicia of anticompetitiveness, such as the quality of care, which is often determinative for consumers of medical services. *See Robinson v. Magovern,* 521 F.Supp. 842, 877 (W.D.Pa.1981). Other than alleging that his business declined as a result of the loss of his privileges at ACMC, not a surprising consequence, Plaintiff has provided no evidence of rising prices or a decline in quality of care. In fact, when asked what he thought of some of the other surgeons at ACMC, Plaintiff would not comment.

Finally, as the Third Circuit stated in *Mathews,* "peer review actions, when properly conduced, generally enhance competition and improve the quality of medical care." *Id.* at 640. "We are reluctant to draw inferences of an antitrust conspiracy from ambiguous circumstantial evidence in cases where the challenged activity promotes competition. Evidence of conduct, which is 'as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy.'" *Id.* at 640 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). For the reasons stated above, Plaintiff has failed to satisfy his burden in establishing that Defendants' actions had an anticompetitive effect on the market for general surgery.[2]

---

**2.** Defendants do not contest that their actions had an effect on interstate commerce.

## b. Relevant Markets

 Plaintiff also has the burden of proving the relevant product and geographic markets. *See Tunis,* 952 F.2d at 722, 726. Plaintiff suggests that the relevant product market is general surgery and that the relevant geographic market is Atlantic County. Because general surgery is rather broadly defined, Defendants understandably have not contested Plaintiff's assertion. However, they have questioned the relevant geographic market.

"The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pa.,* 745 F.2d 248, 260 (3d Cir.1984) (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). Therefore, "the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." *Tunis,* 952 F.2d at 726. Moreover, the definition of the relevant market "must take into account the realities of competition." *Weiss,* 745 F.2d at 826.

Plaintiff has provided no evidence, statistical or otherwise, to corroborate his claim that Atlantic County is the relevant geographic market. Viewed from the patient's perspective rather than the physician's, general surgery patients might well take advantage of the various medical facilities in Philadelphia an hour or so away,[3] and, as Plaintiff conceded, he himself has referred patients to surgeons in Philadelphia.[4]

## 3. Rule of Reason Analysis

 Because Plaintiff has not alleged that Defendants' actions were per se illegal, the Court applies the "rule of reason" to evaluate Plaintiff's claim. *See Weiss,* 745 F.2d at 820. "Under the rule of reason, the burden of proof in establishing that particular practices are unreasonable restraints of trade rests on the plaintiff; the defendants are not required to prove that the practices are reasonable." *Brown v. Our Lady of Lourdes Med. Center,* 767 F.Supp. 618, 629 (D.N.J.1991) (quoting ABA Antitrust Section, Antitrust Law Developments 15 (2d ed.1984)).

 As the court in *Brown* concluded, " 'the use of a hospital's internal review procedures does not imply [an] anticompetitive state of mind. Review procedures are necessary to insure that hospital staff members are competent medical practitioners.' A medical staff is permitted to exclude an individual doctor based on that doctor's lack of professional competence or unprofessional conduct." *Id.* at 628 (internal citation omitted).

Here, as in *Brown,* Plaintiff has failed to satisfy his burden in demonstrating that Plaintiff's actions were unreasonable. Plaintiff's was afforded several levels of review of his case, at each of which levels the relevant body found that Plaintiff should not be reinstated. While Plaintiff may be able to show that he and Drs. Aarons and Previti were in competition professionally, he has not shown conclusively that they conspired against him, let alone that their conspiracy infected ACMC's review process at every level. In short, the evidence is as "consistent with permissible competition and the promotion

---

**3.** There are several other hospitals in New Jersey in the corridor between Atlantic City and Philadelphia.

**4.** Plaintiff suggests that the submarket for trauma services is more geographically restricted because of the emergent nature of the injuries. Yet, a trauma patient midway between Philadelphia and Atlantic City might just as likely go to Philadelphia or Camden as she would go to ACMC's trauma facility. Even if Plaintiff is correct that the submarket for trauma is more restricted, he nevertheless fails to establish that Defendants' actions had any anticompetitive effect on that market. Plaintiff was replaced on the trauma staff after he relinquished his privileges, so output has not been restricted. Nor has there been any showing that prices have risen.

of quality patient care" as it is with allegations of an antitrust conspiracy, if not more so. *Mathews,* 87 F.3d at 640.

### 4. Injury to Plaintiff

■ As mentioned above, the focus of the Court's inquiry in antitrust is on the alleged restraint of trade's effect on competition, not competitors. Nevertheless, Plaintiff has the burden of establishing that he suffered an injury as a result of the alleged restraint of trade. Plaintiff alleges that he lost anywhere between $250,000 and over $500,000 as a result of his loss of privileges at ACMC. First, in light of the fact that Plaintiff voluntarily relinquished his privileges initially, there is some question whether he can allege damages at all. But even if he could, he has provided no evidence that his patients could not have still utilized his services at Shore Memorial Hospital, where Plaintiff retained his privileges and which is just a few miles away from ACMC. *Cf. Jefferson Parish Hosp.,* 466 U.S. at 30, 104 S.Ct. 1551.

As a result of the foregoing, Plaintiff has failed to satisfy his burden in establishing a claim under Section 1 of the Sherman Act.

### B. Sherman Act Section 2

Section 2 of the Sherman Act focuses on unitary action and provides that it shall be illegal for:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize any part of the trade or commerce among the several States, or with foreign nations. . . .

15 U.S.C. § 2 (1994).

■ To demonstrate a monopoly, Plaintiff must provide evidence of "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co.,* 504 U.S. at 481, 112 S.Ct. 2072. Because the focus of Section 2 is on unitary action rather than concerted activi-

ty, a showing of "[m]onopoly power requires, of course, something greater than market power under § 1." *Id.* at 480, 112 S.Ct. 2072. Because Plaintiff failed to establish that the Defendants had market power under Section 1, he necessarily fails to overcome the higher threshold required to satisfy monopoly power under Section 2.

■ Plaintiff may also try to establish that Defendants attempted to monopolize by showing that they "had a specific intent to monopolize the relevant market; engaged in anticompetitive conduct or exclusionary conduct to implement the specific intent; and that Defendants possess sufficient monopoly power that there was a dangerous probability of success." *Farr,* 1993 WL 220680, at *10. Not only has Plaintiff not carried his burden in establishing that Defendants had specific intent to monopolize—if anything, ACMC would maximize its revenues by giving staff privileges to every doctor who applied—but the defendants also lacked sufficient monopoly power such that there was a "dangerous probability of success." *See Weiss,* 745 F.2d at 828.

■ Finally, Plaintiff may attempt to show that a conspiracy or combination to monopolize by demonstrating that there was "(1) an agreement or understanding between two or more economic entities, (2) a specific intent to monopolize the relevant market, (3) the commission of an overt act in furtherance of the alleged conspiracy, and (4) that there was a dangerous probability of success." *Farr,* 1993 WL 220680, at *11. As discussed with respect to Section 1, although there may have been a combination, i.e. the peer review committees of the medical staff, there is no evidence that any of the committees acted to further a conspiracy against Plaintiff, and Plaintiff has failed to satisfy his burden of establishing a claim under Section 2 of the Sherman Act.

### C. Clayton Act Section 4

Section 4 of the Clayton Act provides that:

any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States ... without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a) (1994). Because the Court finds that Plaintiff failed to establish under Section 1 or 2 of the Sherman Act that Defendants violated the antitrust laws and that Plaintiff suffered an injury as a result of such an alleged violation, Plaintiff can not recover under Section 4 of the Clayton Act. *See Garshman v. Universal Resources Holding, Inc.*, 824 F.2d 223, 234 (3d Cir.1987).

### D. New Jersey Antitrust Act

■ The New Jersey Antitrust Act provides that:

It shall be unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State.

N.J.S.A. 56:9–4(a). It further states:

This act shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it.

N.J.S.A. 56:9–18; see also *Kugler v. Koscot Interplanetary, Inc.*, 120 N.J.Super. 216, 293 A.2d 682, 694 (1972) (noting that the New Jersey Act was modeled on the Sherman Act and stating that "it is apparent that the federal decisions interpreting sections 1 and 2 of the Sherman Act provide this court with guidelines for interpreting similar sections of the New Jersey Act"). As the Defendants point out, the New Jersey statute departs from the federal statute only in that it does not require that the allegedly monopolistic activity af-

fect *interstate* commerce. Because the Court finds that Plaintiff has failed to establish a claim under Section 2 of the Sherman Act, Plaintiff likewise has not carried his burden of establishing a claim under the New Jersey Antitrust Act.[5]

### E. State Tort and Contract Claims

■ Under 28 U.S.C. § 1367(c), a district court "may decline to exercise jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." The Third Circuit has stated that where a party's federal claims are disposed of on a summary judgment motion, the court should generally refrain from exercising supplemental jurisdiction over the remaining state claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 195–96 (3d Cir.1976); *see also Simmerman v. Corino*, 804 F.Supp. 644, 658 (D.N.J.1992). Additionally, Plaintiff's anticipation that Defendants will raise a federal defense to his state claims— namely immunity under the Health Care Quality Improvement Act, 42 U.S.C. § 11101, *et seq.*—is insufficient to establish this Court's original jurisdiction over his state tort and contract claims. *See Louisville & N R Co v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908). Finally, there are no extraordinary circumstances, such as a substantial investment of time, which would warrant this Court's retaining supplemental jurisdiction over the Plaintiff's remaining state tort and contract claims. *See Hewlett v. Davis*, 844 F.2d 109, 115 (3d Cir.1988).

### IV. CONCLUSION

For the reasons set forth above and there being no genuine issue of material fact, Defendants' motion for summary judgment is granted as to the Plaintiff's federal antitrust claims under Sections 1 and 2 of the Sherman Act and Section 4 of

---

**5.** It is worth noting that Plaintiff does not allege a claim under N.J.S.A. 56:9–3, the New Jersey analogue to Section 1 of the Sherman Act.

the Clayton Act and his state antitrust claim under the New Jersey Antitrust Act. Plaintiff's remaining state tort and contract claims are dismissed without prejudice. The Court will enter an appropriate order.