## In re REMERON DIRECT PURCHASER ANTITRUST LITIGATION.

### No. 03–0085(FSH).

United States District Court, D. New Jersey.

Feb. 18, 2005.

Franklyn C. Steinberg, III, Steinberg Law Offices, Somerville, NJ, for Movant.

Lisa J. Rodriguez, Trujillo Rodriguez & Richards, LLP, Haddonfield, NJ, Rebekah R. Conroy, Cohn Lifland Pearlman Hermann & Knopf LLP, Saddle Brook, NJ, for Plaintiff.

Kevin J. McKenna, Mara E. Zazzali, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, PC, Newark, NJ, for Defendant.

## OPINION & ORDER

HOCHBERG, District Judge.

### INTRODUCTION

This matter comes before the Court upon the parties' cross motions for summary judgment. Three issues remain in this antitrust case: (a) whether Defendants had monopoly power in a relevant market, (b) whether Defendants used such monopoly power to monopolize the market by delaying the listing of their drug combination in the FDA's Orange Book, and (c) whether Defendants used such monopoly power to monopolize the market through an overall scheme. Defendants have filed a motion for summary judgment on all three issues. Plaintiffs have filed two motions for partial summary judgment—one on the issue of monopoly power and the other on the issue of monopolization by delayed-listing.

This opinion analyzes both parties' respective summary judgment motions with respect to the "direct evidence" approach for determining Defendants' market power, which is the sole basis of Plaintiffs' motion for summary judgment on monopoly power and is one issue of Defendants' motion.[1] The Court reviews the motions on the papers in accordance with Fed. R.Civ.P. 78.

### BACKGROUND

Organon, Inc. and Akzo Nobel N.V. ("Defendants" or "Organon") manufacture the antidepressant drug mirtazapine, commercially marketed as Remeron. Mirtazapine was originally claimed in their now-expired United States Patent No. 4,062,848 (the "'848 patent") and introduced in the

---

1. In a future opinion, this Court shall analyze Defendants' summary judgment motion with respect to the traditional market definition approach for determining market power. The opinion shall consider mirtazapine in the context of the several other antidepressant compounds in order to determine the bounds of the relevant antitrust market that a reasonable juror could find.

United States in 1996. Including patent and regulatory exclusivities, Organon's exclusive right to manufacture and sell mirtazapine expired on June 14, 2001.

Mirtazipine is alone in the selective noradrenergic/serotonergic class of antidepressants ("NSSA"). The oldest commonly used antidepressants are those in the selective serotonin reuptake inhibitor class ("SSRI") which includes, among others, brand-names Prozac, Paxil and Zoloft. Other antidepressants recently marketed in the United States include brand name Effexor (alone in the SNRI class), brand name Desyrel (alone in the SARI class), and brand name Wellbutrin (alone in the NDRI class).

On November 2, 1999, Organon was granted United States Patent No. 5,977,-099 (the "'099 patent") for a method of treating depression using a combination of mirtazapine and a SSRI. In January 2001, fourteen months after being granted the '099 patent, Organon submitted the '099 patent to the United States Food and Drug Administration ("FDA") for listing in the APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS ("Orange Book").[2]

Beginning in February 2001, several generic drug manufacturers ("Generics") filed Abbreviated New Drug Applications ("ANDAs") with the FDA, seeking approval for their generic version of mirtazapine. The Generics each filed a certification, under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Paragraph IV Certifications"), which stated that the '099 patent was invalid or would not be infringed by their generic version of mirtazapine.

Organon thereupon sued the Generics for inducement to infringe the '099 patent. Because Organon sued each of the Generics within forty-five days of receipt of the Paragraph IV Certifications, FDA approval of the generic ANDAs was automatically stayed by operation of the Hatch–Waxman Act and would remain stayed until the earlier of thirty months or a judicial determination that the '099 patent was invalid or not infringed. *See* 21 U.S.C. § 355(j)(5)(B)(iii). On December 18, 2002, this Court ruled that the Generics' sale of mirtazapine did not induce infringement of the '099 patent. *See Organon Inc. v. Teva Pharms., Inc.,* 244 F.Supp.2d 370 (D.N.J. 2002) (*"Organon I "*).

The Generics filed counterclaims against Organon for antitrust violations under the Sherman Act including (1) improperly listing the '099 patent in the Orange Book and (2) baselessly initiating patent infringement actions against the Generics. *Organon Inc. v. Mylan Pharms., Inc.,* 293 F.Supp.2d 453 (D.N.J.2003) (*"Organon II "*). This Court granted Organon's motion to dismiss both of these claims on December 3, 2003 because (1) the language of 21 U.S.C. §§ 355(b)(1), (c)(2) and 21 C.F.R. § 314.53(b) "gave Organon a reasonable basis for listing in the Orange Book" and (2) Organon had an objective basis to believe it could assert a claim of patent infringement.[3] *Organon II,* 293 F.Supp.2d at 459, 461. The Generics and Organon settled the Generics' remaining counterclaims in April 2004.[4]

---

**2.** The FDA lists the patent numbers in the Orange Book that the New Drug Application ("NDA") identifies as being associated with that NDA.

**3.** Until the Federal Circuit decided *Warner–Lambert Co. v. Apotex Corp.,* 316 F.3d 1348 (Fed.Cir.2003), holding that Hatch Waxman does not permit an action for induced infringement in a case with facts mirroring

those in *Organon I,* it was not clear that the patent infringement actions were lacking in merit.

**4.** These remaining counterclaims included fraudulent procurement of the '099 patent from the U.S. Patent and Trademark Office ("PTO") and late-listing of the '099 patent in the FDA Orange Book, both of which the current Plaintiffs have pursued.

In the action now before the Court, Plaintiffs are the direct purchasers of mirtazapine who allege injury from having paid higher prices as a result of delayed Generic entry. As did the Generics, Plaintiffs allege that Organon improperly delayed listing the '099 patent in the Orange Book for the purpose of extending their monopoly on the mirtazapine market. Had Organon listed the '099 patent within 30 days after its issuance (December 2, 1999) as required by FDA rules, Plaintiffs allege the Generics could have filed Paragraph IV certifications as early as June 15, 2000. However, because the '099 patent was not listed in the Orange Book until February 1, 2001, the first ANDAs for generic mirtazapine were not filed until February 28, 2001, and the Hatch–Waxman contesting process and Generic entry were delayed.

Plaintiffs also allege "an overall scheme" to monopolize the relevant market, claiming that, when taken together, the allegations against Organon constitute an antitrust violation even if the individual allegations are not found to violate antitrust laws.[5] Necessary to finding for Plaintiffs on either of these issues is an initial determination that Organon had monopoly power in a relevant market.

### SUMMARY JUDGMENT STANDARD

Pursuant to Fed.R.Civ.P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-al fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, "summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.,* 843 F.2d 139, 143 (3d Cir.1988). All facts and inferences must be construed in the light most favorable to the non-moving party. *Peters v. Delaware River Port Auth.,* 16 F.3d 1346, 1349 (3d Cir.1994). The judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrate, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 860 (3d Cir.1990).

The party seeking summary judgment always bears the initial burden of production. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. This burden requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or to demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue

---

**5.** Plaintiffs' several other claims were dismissed by Order of this Court dated September 8, 2004. Like the Generics, Plaintiffs alleged that (1) Organon obtained the '099 patent through fraud on the PTO, (2) Organon improperly listed the '099 patent in the Orange Book, and (3) Organon baselessly initiated patent infringement actions in *Organon I.* This Court dismissed those claims because Plaintiffs lacked standing to bring the fraud claim, and because the improper listing and baseless litigation claims had already been dismissed by this Court as to the Generic Plaintiffs in *Organon II* and were thus precluded by the doctrine of collateral estoppel or the doctrine of law of the case. Several direct purchaser Plaintiffs settled with Organon soon after the Order.

on which it bears the burden. *See id.* at 322–23, 106 S.Ct. 2548. Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party.

To avoid summary judgment, the non-moving party must then demonstrate facts supporting each element for which it bears the burden, and it must establish the existence of a "genuine issue of material fact" justifying trial. *Miller,* 843 F.2d at 143; *see also Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 quoting *First National Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). Further, summary judgment may be granted if the nonmoving party's "evidence is merely colorable or is not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

### *DISCUSSION*

Section 2 of the Sherman Act "sanctions those 'who shall monopolize, or attempt to monopolize ... any part of the trade or commerce among the several states.'" *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430 (3d Cir.1997) quoting 15 U.S.C. § 2. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S.

585, 596 n. 19, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d at 437 (same); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 749 (3d Cir.1996) (same); *Bonjorno v. Kaiser Aluminum & Chemical Corp.,* 752 F.2d 802, 808 (3d Cir.1984) (same).

Under antitrust law, summary judgment on the issue of monopoly power utilizes the same standard as that applied in other contexts, despite the highly fact-intensive nature of determining monopoly power. A defendant "deserves summary judgment if it can establish that, as a matter of indisputable fact, it lacks sufficient [market] power." *Town Sound v. Chrysler,* 959 F.2d 468, 479 (3d Cir.1992). The Third Circuit recognizes that "the question of market power is certainly dependant on factual findings, and some older cases did state that summary judgments against plaintiffs are particularly disfavored in complex antitrust cases," however, "many courts, including the Supreme Court, have more recently held defendants entitled to summary judgment in antitrust cases ... the standard of F.R.C.P. 56 remains the same." *Id.* at 481; *see also Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.,* 386 F.3d 485, 495 (2d Cir.2004) (holding summary judgment "is an essential tool in the area of antitrust law because it helps avoid wasteful and lengthy litigation that may have a chilling effect on pro-competitive market forces") citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 593–94, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Plaintiffs do not seek summary judgment on the issue of monopoly power through the traditional market definition approach. Rather, Plaintiffs proffer "direct evidence" to attempt to meet their burden to prove that Defendants had mo-

nopoly power in a relevant product market before generic entry and to define that relevant market.[6] Although the Supreme Court and Third Circuit have not expressly endorsed such an approach in a section 2 case,[7] this Court shall consider Plaintiffs' direct evidence given the existence of some law among other Circuits that permits direct evidence to be used to establish monopolization. *See Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*, 386 F.3d 485, 500 (2d Cir.2004) (stating that monopoly power "can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market") citing *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir.1998); *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C.Cir. 2001) ("where evidence indicates that a firm has in fact profitably [raised prices substantially above the competitive level], the existence of monopoly power is clear"); *Re/Max Intern. v. Realty One, Inc.*, 173 F.3d 995, 1018 (6th Cir.1999) ("an antitrust plaintiff is not required to rely on indirect evidence of a defendant's monopoly power, such as high market share within a defined market, when there is direct evidence that the defendant has actually set prices or excluded competition").[8]

The direct evidence Plaintiffs proffer is the following:[9] When generic mirtazipine

---

6. Plaintiffs further assert that their proffered direct evidence makes it unnecessary to even define a relevant antitrust product market.

7. Indeed, although not explicitly forbidding a direct evidence approach, the Third Circuit has emphasized the importance of establishing monopoly power by the traditional market definition approach, i.e. first defining a relevant market by product interchangeability or crossprice elasticity of demand and then determining monopoly power therein by evaluating market share. *E.g., Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 199–201 (3d Cir.1992) (defining product by market by reasonable interchangeability of use and then analyzing monopoly power by market share analysis because "starting point must be to determine [the defendant's] market share of the resilient product market"); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063–65 (3d Cir.1978) (asserting that " 'in s 2 cases, the search for the relevant market must be undertaken and pursued with relentless clarity ... reasonable interchangeability of use or the cross-elasticity of demand determines the boundaries of a product market' " and subsequently analyzing monopoly power within the defined market through market share analysis) quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d at 436, 442 ("where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand ... the relevant market is legally insufficient and a motion to dismiss may be granted"); *American Bearing Co., Inc. v. Litton Industries, Inc.*, 729 F.2d 943, 949 (3d Cir.1984) ("the market power analysis begins with a definition of the relevant product market for the particular product and is an element of a section 2 violation that plaintiff must establish to prevail").

8. However, these cases do not utilize direct evidence in the ways Plaintiffs argue that this Court should. First, none of them of use direct evidence to define the antitrust product market or find that it is unnecessary to do so. Second, where they do evaluate direct evidence to analyze monopoly power in an already defined product market (whether by stipulation or traditional methodology), they find the direct evidence presented to be insufficient and ultimately utilize traditional market power analysis instead.

9. This evidence was averred by uncontested certification of Plaintiffs' economic expert, Dr. Jeffrey Leitzinger. Specifically, the net price of Remeron upon generic entry in January 2003 was $2.29 per 15mg tablet. The first generic, Teva, entered the market at that time with a net price of $1.37. Six months later, several other generics entered the market with Mylan pricing at $0.49 and Teva

producers were finally able to enter the market, they did so with prices that were substantially lower than the price of their bioequivalent brand name competitor, Remeron. As more generic producers entered the market, the price of generic mirtazapine continued to decline. Plaintiffs consequently conclude that because Organon's brand name price was much greater than the subsequent generic price for mirtazipine, Organon necessarily had monopoly power prior to generic entry.[10]

Although the Third Circuit has not considered finding monopoly power based on direct evidence similar to that proffered by Plaintiffs, the Second Circuit did so last year in *Geneva Pharmaceuticals v. Barr Laboratories.* The Court reviewed evidence similar to that proffered here and affirmed the lower court's decision to grant partial summary judgment for the defendant because the plaintiff could not establish monopoly power. *Geneva Pharmaceuticals,* 386 F.3d at 500.[11] The plaintiff there, a generic producer of prescription blood thinner, alleged that a competing generic producer that had first entered the blood thinner market after decades of blood thinner production solely by the brand name producer, was monopolizing the generic blood thinner market in violation of section 2 of the Sherman Act. *Id.* at 494. The plaintiff sought to prove monopoly power by direct evidence that the defendant substantially lowered its prices only after the plaintiff entered the market with a much lower price. *Id.* at 500. Simply based on the defendant's ability to quickly lower its price to match the plaintiff's, the plaintiff argued that the defendant was a monopolist that "had charged a monopoly price that lasted until plaintiffs finally entered the market, ... direct proof that [the defendant] controlled prices during its period of exclusivity." *Id.*

The Second Circuit rejected the plaintiff's evidence as insufficient as a matter of law. "This direct proof is at best ambiguous," the Court concluded because the plaintiff provided no evidence of the defendant's price-cost margin and no evidence

---

lowering its price to $0.47. By October 2003, Teva priced at $0.17 and Mylan priced at $0.16. Plaintiffs' summary judgment brief, in several sections, acknowledges this set of facts to be "small."

**10.** Plaintiffs also offer the following as direct evidence of market power: (1) testimony of Plaintiffs' economic expert, Dr. Jeffrey Leitzinger that for a 3-year period prior to generic entry Remeron's price had increased from approximately $1.86 per tablet to approximately $2.29 per tablet, (2) Organon's internal documentation showing that Organon lost a significant percentage of its sales following generic entry, and (3) testimony of a Defense economic expert, Dr. Januz Ordover, that Organon had the ability to charge prices above short-run marginal cost prior to generic competition. Plaintiffs devote only a few sentences discussing these facts and offer no analysis about how these facts suffice to permit a reasonable juror to find monopoly power. As will be discussed, without evidence that sheds light on material factors such as

Organon's price relative to its total costs (marginal *and* fixed) and whether output was restricted, monopoly power cannot be found as a matter of law. *See, e.g.,* PHILLIP E. AREEDA AND HERBERT HOVENKAMP, ANTITRUST LAW, AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, p. 516 (2d ed. 2002) ("No matter how accurately measured, of course, a substantial excess of price over marginal cost does not necessarily bring excess returns on investment. A firm generates excess profit only if price exceeds its average *total* cost, including its cost of capital.") (emphasis added); William M. Landes and Richard A. Posner, *Market Power in Antitrust Cases,* 94 HARV. L.REV. 937, 939 (1981) ("When the deviation of price from marginal cost ... simply reflects certain fixed costs, there is no occasion for antitrust concern.").

**11.** In *Geneva Pharmaceuticals,* the market was already defined by traditional methodology, thus direct evidence was only considered to establish monopoly power within the market.

that the defendant restricted output. The Court stated:

> [A]bsent from plaintiffs' proffer is any analysis of [the defendant's] costs. Hence, we do not know whether the allegedly elevated prices led to an abnormally high price-cost margin. [citation omitted] Nor do plaintiffs present direct evidence that defendants restricted output, asking us to infer the basis for the higher prices.

*Id.*

■ While *Geneva Pharmaceuticals* was a battle between two generic producers, its logic applies equally to direct evidence of a cheaper price by generics as compared with a brand name drug. As in *Geneva Pharmaceuticals,* Plaintiffs here provide no evidence of excessive price-cost margins or restricted output but merely rely on the fact that later generic manufacturers could enter the market more cheaply than Remeron's price in order to establish monopoly power.[12] *Geneva Pharmaceuticals's* holding is even more persuasive in the present case: the *Geneva Pharmaceuticals* plaintiffs could at least insinuate that the defendant had some power over price by the fact that the defendant lowered its price in response to generic entry. Here, Plaintiffs provide no evidence that Organon reduced the price of Remeron after generic entry in order to compete with the cheaper generic price.

Furthermore, unlike in *Geneva Pharmaceuticals,* the Defendant here is a brand name (not generic) manufacturer whose initial fixed costs (including research, development, and the cost of being the first to gain FDA drug approval) are significantly higher than those of generic manufactures because the Hatch–Waxman Act allows generic manufacturers to gain much of the benefit of a brand name manufacturers initial fixed costs by filing an ANDA. *See* Elizabeth Stanley, *An Ounce of Prevention: Analysis of Drug Patent Settlements Under the Hatch–Waxman Act,* 10 Geo. Mason. L.Rev. 345, 346 (2002) ("Congress sought to balance competing interests by promoting the availability of low-cost generic drugs through simplified regulatory procedures ... an applicant subsequent to the pioneer applicant seeking to manufacture generic versions of the pioneer drug, is not required to file a complete NDA. The generic applicant need only complete an Abbreviated New Drug Application (ANDA) that relies on the safe-and-effective clinical findings of the pioneer drug"); *Glaxo Inc. v. Novopharm Ltd.,* 110 F.3d 1562, 1568 (Fed.Cir.1997) (stating that Hatch–Waxman legislation was "designed to benefit makers of generic drugs, research-based pharmaceutical companies, and not incidentally the public") citing H.R.Rep. No. 98–857(I), at 14–15 (1984) (purpose of Hatch–Waxman is "to make available more low cost generic drugs").[13] That *Geneva Pharmaceuticals*

---

**12.** Plaintiffs concede that "price/cost differential is a standard economic definition of market power" in their Rule 56.1 statement in support of their motion for partial summary judgment.

**13.** In addition, Plaintiffs provided expert testimony that made this point. In his report, Plaintiffs' expert pharmaceutical economist, Dr. Stephen Schondelmeyer, stated "Hatch–Waxman simplified the regulatory hurdles for prospective generic drug manufacturers by eliminating the need for generic companies to file lengthy and costly NDAs in order to ob-

tain FDA approval. Instead, such companies ... rely on the safety and effectiveness data already supplied to the FDA by the brand name manufacturer ... [thus] the first generic competitor to enter a market typically does so at a price substantially lower than the price of the equivalent brand-name drug." Plaintiffs also offered the deposition of Dr. Juanz Ordover, Organon's economic expert, wherein he stated "the ability of the generics to price as low as they did is a peculiar feature, a particular feature of the pharmaceutical marketplace surrounded by the various regulatory provisions."

demanded more evidence than simply lower prices where the defendant was a generic manufacturer, *a fortiorio,* leads to the same conclusion here where Defendants are brand name manufacturers.

Plaintiffs do not cite a case finding market entry of lower priced products to be indicative of a prior monopoly. Plaintiffs only cite cases where the court states that anticompetitive conduct "might" or "may" exist where there is sudden evidence of a change in sales and profits, or where there is a dramatic fall in prices. *See In re Shopping Carts Antitrust Litig.,* 95 F.R.D. 299, 309 (S.D.N.Y.1982); *In re Folding Carton Antitrust Litig.,* 83 F.R.D. 251, 254 (N.D.Ill.1978). The cases cited pertain to section 1 conspiracy claims which have a lower standard for finding market power than cases under section 2 and are inapplicable here. *See, e.g., Eastman Kodak Co. v. Image Technical Servs.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (stating "[m]onopoly power under § 2 requires, of course, something greater than market power under § 1") quoting *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *Carpet Group International v. Oriental Rug Importers Ass'n,* 256 F.Supp.2d 249, 286–87 (D.N.J.2003) (same); *Urdinaran v. Aarons,* 115 F.Supp.2d 484, 491 (D.N.J.2000) (same); JULIAN O. VON KALINOWSKI, ANTITRUST LAWS AND TRADE REGULATION § 25.03[2] (2004) (same).

If the direct evidence approach can ever supplant the market definition approach in a § 2 context, it can only do so where a reasonable juror could find the evidence conclusive as to why Defendants' prices were higher. *Geneva Pharmaceuticals,* 386 F.3d 485, 500 ("where direct evidence is unavailable or inconclusive, as here, monopoly power may be inferred from" the market definition approach); *Blue Cross & Blue Shield v. Marshfield Clinic,* 65 F.3d

1406, 1411–12 (7th Cir.1995) ("a reasonable finder of fact cannot infer monopoly power just from higher prices—the difference may reflect a higher quality more costly to provide—and it is always treacherous to try to infer monopoly power from a high rate of return"); *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir.1997) (holding that high prices with no showing of restricted output failed to establish monopoly power). The Plaintiffs' one-track focus on the price of Remeron compared to the price of generic mirtazipine says nothing about the most important factors that would allow a reasonable juror to conclude that Organon had monopoly power.

Indeed, Plaintiffs' approach, if applied beyond this case, would render most brand name pharmaceutical companies as *per se* monopolists prior to generic entry. Generics normally enter the market with prices significantly lower than that of the first brand name manufacturers. Plaintiffs themselves proffer a statement of Defendants' principal economic expert in the litigation against the Generics, Dr. Ernst Berndt, describing this phenomenon:

> Generic manufacturers typically charge substantially lower prices that their bioequivalent counterparts. Since Hatch–Waxman, following patent expiration, there is a high likelihood of rapid entry by multiple generic manufacturers. The subsequent price competition implies a correspondingly rapid loss of the brand's market share to generics, and a generally rapid decline in the price of the generic.

*See also supra* note 13 and accompanying text.

Clearly, there must be more proof than just a showing that a brand name drug costs more than a generic equivalent. The Supreme Court has held that monopoly power cannot automatically be considered conferred upon a patent holder without

more evidence of market power. *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corporation,* 382 U.S. 172, 178, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). "There may be effective substitutes for the device which do not infringe the patent," the Court stated, so monopoly power "is a matter of proof." *Id.* Plaintiffs seek to use nothing beyond the typical reality facing patent holders in the pharmaceutical market (high brand name prices relative to that of generic entrants) as the sole basis for inferring that the brand name patent holder has monopoly power. Plaintiffs' direct evidence is insufficient as a matter of law.[14]

### ORDER

Accordingly, **IT IS** on this 18th day of February 2005,

**ORDERED** that Plaintiffs' motion for partial summary judgment on the issue of establishing monopoly power is **DENIED**; and it is further,

**ORDERED** that Defendants' motion for summary judgment with respect to the establishing monopoly power via the direct evidence approach is **GRANTED**.

**14.** Since Plaintiffs' direct evidence fails to establish monopoly power, *a fortiori,* it cannot define the relevant product market (or render it unnecessary to do so), as Plaintiffs suggest.